STATE OF LOUISIANA

VERSUS

DAVON GILMORE

NO. 24-KA-552

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 22-2656, DIVISION "B"
HONORABLE R. CHRISTOPHER COX, III, JUDGE PRESIDING

August 27, 2025

**JUDE G. GRAVOIS**
**JUDGE**

Panel composed of Judges Jude G. Gravois,
Marc E. Johnson, and Scott U. Schlegel

<u>**AFFIRMED**</u>
　　**JGG**
　　**MEJ**
　　**SUS**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
Honorable Paul D. Connick, Jr.
Thomas J. Butler
Juliet L. Clark

COUNSEL FOR DEFENDANT/APPELLANT,
DAVON GILMORE
Jane L. Beebe

**GRAVOIS, J.**

Defendant, Davon Gilmore, appeals his conviction for the second degree murder of Ahmad Howard. Defendant was tried along with two co-defendants, Daveon Gilmore (his fraternal twin brother), and Orlando Washington, for the homicide, which occurred on February 21, 2022. On appeal, defendant argues that the trial court erred in denying his motion to sever the defendants for trial; in admitting other crimes/*res gestae* evidence (three YouTube rap videos) and denying post-trial motions on the same issue; and in denying post-trial motions as the evidence was insufficient to convict defendant of second degree murder.

For the following reasons, we find no merit to the assignments of error. Defendant's conviction and sentence are accordingly affirmed.

## PROCEDURAL HISTORY

On June 16, 2022, a Jefferson Parish Grand Jury indicted defendant, Davon Gilmore, along with co-defendants Daveon Gilmore and Orlando Washington, with the second degree murder of Ahmad Howard, in violation of La. R.S. 14:30.1.[1] Defendant was arraigned and pled not guilty. Defense motions to suppress evidence and statements were denied after a hearing on March 26, 2024. On May 8, 2024, the State filed a Notice of Intent to Introduce Evidence as *Res Gestae* or in the Alternative under La. C.E. art. 404(B) that was granted after a hearing on July 11, 2024.[2] This evidence consisted of YouTube rap videos as further described below.

On July 17, 2024, defendant's trial counsel filed a Motion to Sever Defendant for Trial, which was denied after a hearing on July 22, 2024. On August 6, 2024, defendant's trial counsel filed a Motion to Reconsider the State's

---

[1] The companion appeal of Orlando Washington is 24-KA-550, and the companion appeal of Daveon Gilmore is 24-KA-551.

[2] On June 11, 2024, defense counsel filed an opposition to the State's "404(B)" motion.

"404(B)" motion that was denied after a hearing on August 8, 2024. Defendant's trial counsel thereafter sought supervisory review of the trial court's granting of the State's "404(B)" motion and denial of the motion to sever. On August 15, 2024, this Court denied the writ application, and on August 17, 2024, the Supreme Court denied writs.[3]

On August 19, 2024, the case proceeded to trial before a twelve-person jury, and on August 24, 2024, the jury unanimously found defendant and his co-defendants guilty as charged. On September 6, 2024, defendant's trial counsel filed a Motion for Post-Verdict Judgment of Acquittal and a Motion for New Trial.

On October 15, 2024, the trial court denied defendant's post-trial motions. Afterwards, on that same day, defense counsel waived sentencing delays, and the trial court sentenced defendant to the statutorily-mandated life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Thereafter, on October 15, 2024, defendant's trial counsel filed a Motion to Reconsider Sentence, which was denied, and a Motion for Appeal, which was granted. This appeal followed.

## FACTS

On the morning of February 21, 2022, while defendant Davon Gilmore (nicknamed "Fat") was stationed nearby, co-defendants Daveon Gilmore (nicknamed "Blackie," Davon's fraternal twin brother) and Orlando Washington allegedly gunned down the victim, Ahmad Howard, who was sixteen years old, as Ahmad waited for the school bus to John Ehret High School on the corner of Betty and Montgomery Streets in the "Betty Street Projects" in Marrero, Louisiana.[4] The Gilmores were 18 years old at the time of the crime; Washington was 17. The

---

[3] *State v. Davon Gilmore*, 24-363 (La. App. 5 Cir. 8/15/24), 2024 WL 3823431, *writ denied*, *stay denied*, 24-1034 (La. 8/17/24), 390 So.3d 1289.

[4] Several witnesses testified that the neighborhood was also referred to as "the jets."

shooting occurred slightly before 7:36 a.m., which is when a 9-1-1 call was received by the Jefferson Parish Sheriff's Office ("JPSO") regarding the shooting. Howard's killing was allegedly in retaliation for the death, nine days earlier, of Ja'Marian Price, a friend of the three co-defendants, whose funeral they were due to attend later on the morning of Howard's death.[5]

Howard's friend and schoolmate, Dechelle Fradieu, witnessed the shooting. She was waiting with her sister in her sister's car on Montgomery Street, facing Betty Street, near the bus stop for the bus to arrive, which usually occurred between 7:40 and 7:50 a.m. She saw two young black males come running from behind a house, shoot Howard multiple times, and then run away. The two assailants started shooting Howard "immediately" when they appeared from behind the nearby house, without interacting with him in any way. The assailants were dressed in all black from head to toe, and wore face masks that showed only their eyes. She remembered hearing at least three to five gunshots, and that both shooters were firing handguns. They started firing when they were about an arm's length away from Howard and continued shooting him as they stood over him for around "a minute."[6] Ms. Fradieu denied seeing either shooter with a rifle. She admitted that she could not identify either shooter, and at trial, she admitted that she did not know any of the defendants.[7]

Detective Steven Keller, the lead detective on the case, said that deputies spoke to a witness, Harson White, who informed them that he heard gunshots, looked out of his window at 1810 Julie Street (which was one street from Betty

---

[5] According to law enforcement testimony at trial, Ahmad Howard was not connected to Price's death. Ahmad Howard's brother, Allen Howard, was an associate of a suspect, Derrick Harry, who was arrested for the killing of Ja'Marian Price. Price was also associated with the Betty Street Youngins ("BSY"), a gang associated with the three defendants.

[6] Dr. Dana Troxclair, forensic pathologist with the Jefferson Parish Coroner's Office, testified that she performed an autopsy on Ahmad Howard. She determined that the cause of death was multiple gunshot wounds and the manner of death was homicide. The victim sustained nine gunshot wounds, three of which were potentially fatal.

[7] Ms. Fradieu's sister, who had also given a statement, could not be located for trial.

Street), saw a black male in black clothing with gloves run past the back of his house, and then saw two additional males running in front of his house towards a nearby canal bank.[8]  Responding deputies were notified that three suspects wearing black hoodies were seen running towards Julie Street, after which they ran towards Mansfield Drive and then along the canal bank, which was muddy.

Deputy Gavin Martin testified that he was employed as a patrol deputy with the Third District in the Jefferson Parish Sheriff's Office, which included Betty Street.  He was familiar with the area of the homicide and identified Betty Street, Mansfield Street, and the nearby canal on a map.  He responded to the scene on Betty Street, along with two or three other deputies who arrived separately at about the same time.  He observed the victim laying on the sidewalk with multiple gunshot wounds, including one to the head.  The victim was not displaying any signs of life.  He located numerous shell casings around the victim's body, including several rifle casings.  Along with the other deputies, he secured the crime scene.  He relayed to the dispatcher that multiple witnesses had advised him they had observed *three* black males wearing black hoodies and masks, carrying guns, running from the scene towards Mansfield Street and the canal behind that street.[9]  He did not see the suspects himself, nor anyone matching their description, at the crime scene.

Through his radio, Deputy Martin heard that other officers saw three black males wearing black hoodies running along the canal bank near Mansfield Street.  He later learned that they were seen getting into a burgundy colored Dodge van and that the vehicle had been stopped by a unit from the Second District at the Walmart on Lapalco Boulevard.

---

[8] Harson White could not be located for trial.

[9] Deputy Martin was wearing a body camera at this time, the video from which was entered into evidence.

Daphne Zeno testified that she was a home sitter and was sitting in her car in a driveway on the morning of the shooting, going through her phone while waiting for someone. Her car was facing Michael Street, a street in Marrero near Betty Street. She told police officers that she saw three people get into a burgundy van.[10] She did not remember how they were dressed and she did not see their faces. Ms. Zeno also stated that she did not know any of the defendants on trial.

Sergeant Colin Dunning with the JPSO also responded to the scene.[11] He was very familiar with the area of the homicide, having patrolled it for almost seven years. He reached the scene within three minutes after the homicide was reported. Without getting out of his vehicle, he immediately determined that the victim was deceased. He spoke with Deputy Martin and then he started canvassing the area for suspects in his vehicle. He determined that the suspects' likely escape route was Mansfield Street, where he parked his patrol unit and started his search on foot. A partner, Deputy Girod Breaux, saw three people fitting the suspects' descriptions moving towards the west along the canal. Sergeant Dunning was approximately a "football field away," and started his chase. The people were walking at first, but started running after they saw him. He saw that all three of them carried objects in their hands, one of which was large, though he could not determine exactly what these objects were because of his distance from them. His training and expertise led him to believe that the large object was a rifle. His body camera recorded his chase from Mansfield Street to an area at Michael and Francis Streets, though it does not show the suspects.[12] The audio from his body camera

---

[10] Ms. Zeno testified that she did not want to be at trial. She testified that her recollection of the events, two years prior, were not as good as when she spoke with the police. The State showed her a video from an officer's body camera where she tells the officer she saw three suspects get into a burgundy van.

[11] Sergeant Dunning left the JPSO on November 24, 2024 for employment in law enforcement in Missouri.

[12] Sergeant Dunning testified that his body camera was activated because he unholstered his weapon. He did so because the victim had been shot and he saw the three males running with

recorded a woman in her vehicle under a carport (who was later identified as Daphne Zeno) telling him that she saw the three suspects get into a burgundy Dodge van.

After the suspects passed to Francis Street, they broke away from him and he lost sight of them. He admitted on cross-examination that he never saw their faces, and was not close enough to determine their height or weight. He did not see the burgundy Dodge van. During his chase, he encountered a man dressed in dark clothes wearing a red hat with a backpack, waiting at a bus stop, but he determined the man was not one of the suspects because he was a great distance from the scene of the homicide, clearly had not been running, and was very clean.[13] And, when he saw the suspects running along the canal, none of them was wearing a red hat nor carrying a backpack.

Sondriell Williams, the mother of co-defendant Orlando Washington, testified under a state subpoena. She knew defendant and his twin brother Daveon; she called them "Fat" and "Blackie." At the time, she and Orlando lived in Biloxi, Mississippi. The night before the homicide, she had driven in for the funeral of Ja'Marian Price, whom her kids had grown up with. The Friday before the funeral, she had dropped Orlando off at Davon and Daveon's house in Westwego and returned to Biloxi. The three of them were to be pallbearers at Price's funeral on the morning of the homicide.

Ms. Williams had prearranged with Orlando, Blackie, and Fat to pick them up on Mansfield Street in Marrero, in the "Betty Projects," to take them to the funeral. She did not know why they wanted to be picked up there instead of in Westwego, but thought they might have friends on that street. That morning,

---

objects in their hands which might be weapons. He also testified that the body camera is designed to record close contact interaction, rather than things happening at a distance.

[13] Sergeant Dunning testified that he had become very dirty from the chase along the canal, with dirt "to his knees."

Orlando asked her to pick them up first before picking up her youngest son, Orlandon. Then Blackie called her to ask what was taking so long. She drove to Mansfield Street to pick up all three boys, but did not see them, so she drove around to Michael Street where she picked them all up together in her burgundy Dodge Caravan. None of them sat in the front seat next to her; all three got in the back, with Orlando in the third seat. She recalled that they all seemed in a hurry. She did not recall what Blackie and Fat were wearing, but her son had on a black jacket. The boys were all dressed similarly with matching shirts because they were to be pallbearers at the funeral. She denied that they were out of breath or sweating when she picked them up. None of them had masks on.

Ms. Williams denied owning any guns or firearms. A DoorDash bag was found in her vehicle with a gun in it, which she denied having any knowledge of.[14] She did not know why her son or the other two had any business in the Betty Projects. She acknowledged that she later learned there were three guns in her car, but she denied knowing that they were there. She did not see any of them get in the van with a firearm.

Detective Scott Bradley testified that he was employed by the JPSO's homicide division and responded to the crime scene at Betty and Montgomery Streets. In his testimony, he identified photographs of the crime scene that were later published to the jury. The photos depicted the street and area where the shooting occurred, and showed evidence markers used by the crime scene technicians to identify evidence, which in this case were casings from a .223 caliber rifle, casings from a 5.56 caliber firearm, and a .40 caliber fired casing, found on the scene, and in the victim's gym bag. He found no surveillance video footage in the area. Detective Bradley said that they were mostly advised that

---

[14] Ms. Williams admitted that she worked for DoorDash, Uber, Lyft, and Waitr.

24-KA-552                                    7

there were three suspects. At a few points, they were told that there were only two, but never just one.

Deputy Brandon Savage of the JPSO Second District testified that he participated in the arrests of the defendants. The Second and Third Districts are adjacent to each other on the Westbank. He had known the Gilmore twins since they were around nine years old from their participation in Jefferson Parks and Recreation basketball where Detective Savage was a coach. He did not know defendant Washington. He was patrolling in the Second District when he received a "Code 2" traffic notification, which is an emergency event where deputies are authorized to use lights and sirens to respond quickly and safely. The notification stated that they were looking for a maroon van occupied by at least three persons. He located the maroon van at a gas station in the Walmart parking lot on Lapalco Blvd. in the Second District, and saw that Deputy David Johnson was already there.[15] Deputy Johnson was speaking with Sondriell Williams, whom Deputy Savage later learned was the driver of the van and Orlando Washington's mother. The suspects were still in the van at this time. Davon saw Deputy Savage and greeted him as "Coach Brandon" and told him they were going to a funeral.

Deputy Johnson noticed a firearm (a rifle) in the van with the defendants, whereupon the defendants were removed from the van and secured.[16] The van was also secured as a crime scene until it could be processed. Deputy Savage testified that all three suspects were sweating when they were arrested. After the defendants were transported to the investigations bureau, he had no further involvement in the investigation.

---

[15] Deputy Savage testified that Deputy Johnson had arrived approximately two minutes before him.

[16] Deputy Savage identified photographs of the firearms, which were entered into evidence.

Deputy David Johnson was employed by the JPSO as a patrol deputy in the Second District. The Third District had put out a "BOLO"[17] for a maroon or burgundy Dodge Caravan that was possibly involved in a shooting on Betty Street.[18] He observed the vehicle at around 8 a.m. on Lapalco Blvd., notified headquarters for backup, and made a traffic stop as the vehicle pulled up to a gas pump at the Murphy station. The driver, Mrs. Williams, saw him approach. She exited the vehicle and asked if she could help him. She advised him that she had just picked up her sons from Manhattan Boulevard in Harvey. At that point, Deputy Savage arrived in his unit. They both approached the vehicle and saw the defendants sitting inside. Deputy Johnson observed that they were all sweating and had mud on their shoes. He saw a rifle-style firearm protruding from under a black jacket laying on the seat. He notified headquarters that there was a firearm in the vehicle, and then he and Deputy Savage pulled the defendants out of the vehicle, secured them in police units, and "locked down" the vehicle.[19] One of the suspects, Daveon, advised him that they had been on Fourth Street in Marrero and were on their way to a funeral. This exchange was recorded by Deputy Johnson's body camera and played for the jury. The deputies detained defendants until other units arrived to assist, and then turned over the investigation to them.[20]

Detective Steven Keller of the JPSO testified that he was assigned as lead detective in this case. The emergency dispatcher's call was played for the jury during his testimony, which described an aggravated battery by shooting on Betty Street, a child on the ground, and *three* subjects wearing black hoodies seen

---

[17] "BOLO" is an acronym for "Be on the lookout."

[18] Deputy Johnson testified that the Second and Third Districts border each other at Barataria Boulevard. He had been driving in the area of Barataria and Lapalco Boulevards.

[19] Deputy Johnson explained that "locked down" means that the vehicle is secured; no one enters the vehicle until it is processed by the crime scene investigators and technicians.

[20] Deputy Johnson testified that Betty Street was nowhere near either location given to him by Mrs. Williams or Daveon.

running westbound towards Julie Street (a block over from Betty Street), and then to Mansfield Street. The last dispatch, with information received from the two deputies who were chasing the suspects,[21] placed them running along the canal and westward. Before going to the investigations bureau to interview witnesses, Detective Keller traveled to the crime scene to get an overview of the area to better understand the scene. Detective Keller identified the various locations on an exhibit comprising an aerial map of the neighborhood.

Detective Keller interviewed Ms. Williams at the investigations bureau. She told him that as she was preparing to pick up Washington to attend the funeral, she received a text or a call from him at approximately 7:35 a.m. to pick him up on Mansfield. One of the twins then called and asked her to pick them up "on Carmadel" (Street). She circled the area looking for her son and the Gilmores and while doing so, observed police activity. She eventually located her son and the Gilmores on Michael Street, after which they hurriedly entered her vehicle, out of breath, and she drove away. When she asked them what they were doing in the Betty Street projects, she told Detective Keller that "they just laughed." From the time she picked them up on Michael Street to the time they were stopped by Deputy Johnson, no one else got in or out of the vehicle.

Detective Ryan Vaught, with the homicide division of the JPSO, assisted Detective Keller with the investigation. In the succeeding days, he attempted to locate any surveillance videos or additional witnesses, but was unsuccessful. He facilitated the towing of the Caravan to the crime scene lab, where it was searched after a warrant was obtained. The search revealed several weapons.

Detective Keller testified that Davon was sitting in the second row seat behind the driver (Ms. Williams), Daveon was next to him, and Orlando was in the

---

[21] Deputy Colin Denning and Deputy Girod Breaux.

third row seat (at the rear of the van). When the van was searched, a 9 mm Smith & Wesson was found in the netting on the back of the driver's seat, fully loaded. A firearm was also found in proximity to Daveon's location in the second seat, passenger side. This was a Glock 22 (.40 caliber) in a DoorDash bag, tucked between the console and the front passenger's seat. Finally, a rifle, a Tegra AR15, was tucked along the third seat and the side of the vehicle, where Orlando had been sitting. Ballistics analysis performed later at the crime lab showed that the rifle and the .40 caliber gun were ballistic matches to the casings found at the scene of the homicide. DNA analysis showed that a mixture of all three defendants' DNA was found on the Glock and the rifle. DNA was also found on the Smith & Wesson, but it was insufficient to analyze.

Detective Keller stated that four cell phones were seized from the van. The digital forensics unit of the JPSO conducted analysis and data extraction, confirming that each phone was owned by an occupant of the vehicle. He confirmed that information was extracted from the phones pertinent to the homicide that confirmed Ahmad Howard was targeted because he was the brother of Allen Howard, an associate of the person suspected of killing Ja'Marian Price, Derrick Harry, but no connection was found between Ahmad and Price themselves.

### ASSIGNMENT OF ERROR NUMBER THREE[22]

#### *Sufficiency of the evidence*

Davon's appellate counsel argues the evidence was insufficient to support Davon's conviction of second degree murder, and therefore, the trial court erred in

---

[22] When the issues on appeal relate to both sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. *State v. Hearold*, 603 So.2d 731, 734 (La. 1992). The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proven beyond a reasonable doubt. *Id.* Alternatively, the accused could be entitled to a reduction of the conviction to a judgment of guilty of a lesser and included offense. *Hearold, supra* (citing La. C.Cr.P. art. 821;

denying his post-trial motions for that reason. She contends Davon was convicted based solely on an alleged gang affiliation. Counsel asserts the State based its entire case that Davon was a principal to the offense on two rap videos posted on YouTube a long time prior to the shooting. Counsel argues that Davon's DNA was not found in any statistically significant manner on the two guns matching the ballistics that were in the van near Daveon and Washington.

Counsel also points out that Davon was not on the group text where the murder was planned. She asserts that although the photograph on the phone taken on the morning of the shooting showed all three defendants in black with ski masks, none of the clothing, jackets, or ski masks found in the van had Davon's DNA on it in any statistically significant amount. She notes that at trial, Deputy Ducote admitted he could not tell the location of Davon's phone that morning. For these reasons, Davon's appellate counsel concludes the evidence was insufficient to support Davon's conviction of second degree murder beyond a reasonable doubt.

The State argues that it proved beyond a reasonable doubt that at the very least, Davon was guilty of the second degree murder of Mr. Howard as a principal in that he was "concerned" in the commission of the killing of the victim. The State further responds that Davon shared with his co-defendants the specific intent to kill the victim or to inflict great bodily harm upon him by accompanying his co-defendants to the location where the homicide was to take place, lying in wait with his co-defendants, stationing himself nearby wearing dark hooded clothing and a mask and armed with a fully loaded weapon, including a chambered bullet, ready

---

*State v. Byrd*, 385 So.2d 248 (La. 1980)). When addressing sufficiency of the evidence, consideration must be given to the entirety of the evidence, including inadmissible evidence which was erroneously admitted, to determine whether the evidence is sufficient to support the conviction. *Id.* at 734. *See also State v. Griffin*, 14-251 (La. App. 5 Cir. 3/11/15), 169 So.3d 473, 483. Therefore, defendant's assigned error concerning sufficiency of the evidence will be addressed first.

to give aid if needed, and fleeing with his co-defendants after the offense was committed.

The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal pursuant to La. C.Cr.P. art. 821. With regard to the motion for a new trial, this Court has recognized that the denial of a motion for a new trial based on the verdict being contrary to the law and evidence is not subject to review on appeal; however, both the Louisiana Supreme Court and this Court have still addressed sufficiency claims under these circumstances. *State v. Ellis*, 18-463 (La. App. 5 Cir. 7/15/19), 276 So.3d 633, 642. Here, defendant filed a motion for post-verdict judgment of acquittal and a motion for a new trial challenging sufficiency of the evidence.[23]

When reviewing sufficiency of the evidence, an appellate court must determine if the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Lane*, 20-181 (La. App. 5 Cir. 1/27/21), 310 So.3d 794, 804. Under the *Jackson* standard, a review of the record for sufficiency of the evidence does not require this Court to determine whether the evidence at the trial established guilt beyond a reasonable doubt, but rather whether, upon review of the

---

[23] On September 6, 2024, defendant's trial counsel filed a Motion for Post-Verdict Judgment of Acquittal pursuant to La. C.Cr.P. art. 821, arguing that the evidence was insufficient to support the verdict. On that same day, she filed a Motion for New Trial pursuant to La. C.Cr.P. art. 851, arguing, among other things, that the verdict was contrary to the law and the evidence.

On October 15, 2024, at the hearing on the motions, counsel additionally argued the State failed to show Davon had the specific intent to kill or cause great bodily harm. Counsel pointed out that Davon was not part of the text chain plotting the murder, he was not the shooter, and there was no evidence he actively participated in the shooting. The prosecutor responded that a person could be a principal to second degree murder and not be the actual shooter. Defense counsel replied that the issue in her Motion for New Trial was that the State failed to show intent as to Davon. After hearing arguments of counsel, the trial judge denied both post-trial motions.

whole record, any rational trier of fact would have found guilt beyond a reasonable doubt. *State v. McKinney*, 20-19 (La. App. 5 Cir. 11/4/20), 304 So.3d 1097, 1103. Additionally, the resolution of conflicting testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *State v. Burnham*, 16-468 (La. App. 5 Cir. 2/8/17), 213 So.3d 470, 474, *writ denied*, 17-664 (La. 4/6/18), 240 So.3d 184. Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *McKinney*, 304 So.3d at 1103.

Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. *State v. Gatson*, 21-156 (La. App. 5 Cir. 12/29/21), 334 So.3d 1021, 1034. When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *State v. Woods*, 23-41 (La. App. 5 Cir. 11/15/23), 376 So.3d 1144, 1155, *writ denied*, 23-1615 (La. 5/29/24), 385 So.3d 700. This is not a separate test from the *Jackson* standard, but rather provides a helpful basis for determining the existence of reasonable doubt. *Id.* All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. *Id.* Evidence of flight, concealment, and attempt to avoid apprehension is relevant and admissible to prove consciousness of guilt from which the trier-of-fact may infer guilt. *State v. Davis*, 18-485 (La. App. 5 Cir. 4/10/19), 269 So.3d 1123, 1132, *writ denied*, 19-716 (La. 11/12/19), 282 So.3d 229.

Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. *State v. Lopez*, 23-335 (La. App. 5 Cir. 8/21/24), 398 So.3d 167, 176-77, *writ denied*, 24-1187 (La. 1/14/25), 398 So.3d 650.

In the instant case, defendant was convicted of second degree murder in violation of La. R.S. 14:30.1, which is defined as the killing of a human being when the offender: 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though the offender has no intent to kill or to inflict great bodily harm. *See State v. Lewis*, 05-170 (La. App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, *writ denied*, 06-757 (La. 12/15/06), 944 So.2d 1277. The written jury charges reflect that the jury was informed that it could convict defendant under the theory that he had the specific intent to kill or inflict great bodily harm.

Additionally, the jury was instructed as to the definition of principals in the written jury charges. Under La. R.S. 14:24, "[a]ll persons concerned with the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." Only those persons who knowingly participate in the planning or execution of a crime are principals to that crime. *State v. King*, 06-554 (La. App. 5 Cir. 1/16/07), 951 So.2d 384, 390, *writ denied*, 07-371 (La. 5/4/07), 956 So.2d 600. Under the law of principals, a person may still be convicted of a crime even if he has not personally fired the fatal shot. *State v. Massey*, 11-357 (La. App. 5 Cir. 3/27/12), 91 So.3d

453, 463, *writ denied sub nom. State ex rel. Massey v. State*, 12-991 (La. 9/21/12), 98 So.3d 332.

Mere presence at the scene of a crime does not make one a principal to the crime. The law of principals requires proof "that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention." *State v. Page*, 08-531 (La. App. 5 Cir. 11/10/09), 28 So.3d 442, 449, *writ denied*, 09-2684 (La. 6/4/10), 38 So.3d 299. An individual may only be convicted as a principal for crimes in which he personally has the requisite mental state, and the intent of the accomplice cannot be imputed to the defendant. *State v. Williams*, 20-46 (La. App. 5 Cir. 12/30/20), 308 So.3d 791, 822, *writ denied*, 21-316 (La. 5/25/21), 316 So.3d 2.

In the instant case, the evidence showed that two males shot the victim while he was walking to the bus stop, after which three black males wearing black hoodies and masks and carrying guns ran from the scene and entered a burgundy Dodge van driven by Washington's mother that was stopped shortly thereafter. (Ms. Fradieu saw two assailants; Mr. Harson White saw two black males in front of his home, near the crime scene, dressed in black and one black male in back of his house also dressed in black.) The evidence also showed that the three defendants were seated inside the van, a Glock pistol was located within reach of Daveon, a rifle was located within reach of Washington, and a Smith & Wesson 9 mm pistol was located within reach of Davon. The evidence further established that casings from the Glock pistol and the rifle were found near the victim at the crime scene, and projectiles and fragments from the rifle were found during the victim's autopsy. Additionally, the State's expert indicated that Daveon's DNA was on the Glock and Washington's DNA was on the rifle.

The evidence further showed that clothing and two masks were retrieved from the van, varying degrees of the defendants' DNA were found on the clothing, and the blue mask contained the DNA of both Washington and Daveon. Also, the evidence established the three defendants were on their way to the funeral of their friend, Ja'Marian Price, on the morning of the murder, and a memorial sweatshirt with Mr. Price's photograph on it was found in the van. The defendants' phones were found in the van, from which data was later extracted, and text messages showed Washington and Daveon helped plan the murder and targeted the victim. The text messages also indicated that Davon had a Smith & Wesson pistol, the same kind of firearm found in front of where Davon was sitting in the van, which left the area of the homicide with the three defendants inside.

Additionally, Detective Keller testified that Ms. Williams said she did not own any firearms and had no knowledge of any guns in the van. Deputy Johnson testified that when he looked inside the van, he saw the three defendants were sweating and had mud on their shoes. Also, Washington's mother testified that none of the defendants had any business being in the Betty Street Projects.

Further, Detective Keller testified that on the morning of the homicide at 6:53 a.m., Washington's phone connected to Uber and logged his travel from Fourth Street to Julie Street, one block west from Betty Street, where he arrived at 7:16 a.m., approximately twenty minutes before the homicide. He further testified that Davon's cell phone also showed that he was in the area of Julie Street at 7:16 a.m. Detective Keller also testified that a video from Daveon's phone created approximately fourteen minutes before the homicide showed the defendants on Betty Street wearing masks and clothing, some of which was later found in the van.

Davon's appellate counsel argues that Davon was not on the text chain regarding the planning of the victim's murder. However, on February 16, five

days before the murder, during the text exchange, Daveon texted the group, "fatt got the smitty." Detective Keller testified that "fatt" was Davon and that "smitty" was a Smith & Wesson firearm. Also, Detective Keller testified that a fully loaded 9 mm Smith & Wesson M&P firearm was located directly in front of Davon in the netting of the driver's seat when the van was stopped shortly after the homicide. Deputy Martin testified that multiple witnesses informed them that they saw three black males wearing black hoodies and masks and carrying guns run from the scene. Further, Detective Ducote testified that on January 26th, Davon sent a text on Instagram stating, "Always gotta plan shi*t out, map it out before you make a move."

Counsel also alleges that Detective Ducote admitted he could not tell the location of Davon's phone that morning. Detective Ducote explained during his testimony, however, that Davon's phone was not powered on at 7:36 a.m. at the time of the homicide because it had died; however, the detective explained it was powered back on at some later point. Nevertheless, Detective Keller testified that on February 21st, at 7:16 a.m., approximately twenty minutes before the homicide, Davon's cell phone showed that he was in the area of Julie Street, which was one block west from Betty Street where the homicide occurred.

Upon review, we find that under the law of principals, a rational juror could have found the evidence was sufficient under the *Jackson* standard to support Davon's second degree murder conviction. The evidence shows that after the victim was shot, Davon, along with Washington and Daveon, ran from the scene wearing masks and carrying guns, after which they hurriedly got into a van driven by Washington's mother. The evidence did not show that the Smith & Wesson pistol was fired at the scene. However, even if Davon was not the shooter, the evidence shows that he was with the co-defendants near the crime scene shortly before the shooting, did nothing to prevent the crime, was standing by at the scene

of the crime ready to give some aid if needed, fled the scene rather than going to the victim's aid, and did not report the shooting. *See Page*, 28 So.3d at 449, where this Court found that even under the law of principals, the evidence was sufficient to support the defendant's second degree murder conviction, pointing out that the defendant remained with "Junior" at the scene, did nothing to prevent the crime, fled the scene rather than coming to the victim's aid after the shooting, and did not attempt to report the shooting.

In light of the foregoing, we find a rational trier of fact could have found the evidence was sufficient under the *Jackson* standard to support Davon's second degree murder conviction. For this same reason, we also find the trial court did not err by denying defendant's Motion for Post-Verdict Judgment of Acquittal.

## ASSIGNMENT OF ERROR NUMBER ONE

### *Denial of Severance*

Davon's appellate counsel also argues the trial court erred in denying his motion to sever the defendants for trial. She contends the defendants should have been severed, as Davon's defense was that his two co-defendants committed the second degree murder. Counsel asserts the evidence showed that there were only two shooters, and the eyewitnesses were not in agreement as to whether there were two or three men running from the shooting and entering the van. She further asserts that although a Smith & Wesson gun was found in front of where Davon was seated in the van, Detective Keller admitted the weapon was not used at the crime scene. Counsel argues that the two guns whose ballistics matched to the shooting were linked to Daveon and Washington.

Counsel also points out that the data extractions of the four cell phones recovered from the van showed that Davon was not on a group text that planned the murder. She argues that Davon's mere relationship and alleged gang association with the two co-defendants was the only evidence of his potential guilt

as a principal to the murder.[24]  Counsel concludes the trial court failed to see the antagonistic defenses, and it was an abuse of discretion to deny the motion to sever.

The State argues, however, that defendant failed to establish that a severance was required or that the trial court abused its discretion by denying his motion to sever.  Contrary to defendant's assertions, the State points out that Davon's co-defendants did not attempt to shift blame to him.  The State asserts it established beyond a reasonable doubt that the evidence was sufficient to prove that Davon at the very least was guilty of second degree murder as a principal.

La. C.Cr.P. art. 704 provides the following regarding severance:

> Jointly indicted defendants shall be tried jointly unless:
>
> (1) The state elects to try them separately; or
>
> (2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.

Whether justice requires a severance must be determined by the facts of each case.  *State v. Molette*, 17-697 (La. App. 5 Cir. 10/17/18), 258 So.3d 1081, 1089, *writ denied*, 18-1955 (La. 4/22/19), 268 So.3d 304.  The ruling on a motion to sever is within the sound discretion of the trial court and will not be overturned unless it is manifestly erroneous and injurious to the defendant.  *Id.*

A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the State.  *State v. Hicks*, 17-696 (La. App. 5 Cir. 10/17/18), 258 So.3d 1039, 1049, *writ denied*, 18-1938 (La. 4/15/19), 267 So.3d 1123.  The defendant bears the burden of proof in a motion to sever.  *State v. Coe*, 09-1012 (La. App. 5 Cir. 5/11/10), 40

---

[24] This assertion is thoroughly refuted in the assignment of error regarding sufficiency of the evidence.

So.3d 293, 301, *writ denied*, 10-1245 (La. 12/17/10), 51 So.3d 17. A "mere unsupported allegation" that defenses will be antagonistic is not sufficient to require a severance. *Hicks*, 258 So.3d at 1049. Furthermore, the fact that each defendant has pointed a finger at the other does not make defenses automatically antagonistic. Prejudice must be shown if defendants are to receive separate trials. Prejudice may occur in a joint trial "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *State v. Williams*, 16-417 (La. App. 5 Cir. 8/30/17), 227 So.3d 371, 395, *writ denied*, 17-1663 (La. 9/14/18), 252 So.3d 483.

Justice does not require severance where only the extent of participation of each defendant is at issue. *State v. Duckett*, 12-578 (La. App. 5 Cir. 5/16/13), 119 So.3d 168, 177, *writ denied*, 13-1383 (La. 1/17/14), 130 So.3d 340 (citing *State v. Gaskin*, 412 So.2d 1007, 1012-13 (La. 1982)). However, where the ends of justice will be best served by severance, it should be granted. *State v. Massey*, 11-357 (La. App. 5 Cir. 3/27/12), 91 So.3d 453, 476, *writ denied sub nom. State ex rel. Massey v. State*, 12-991 (La. 9/21/12), 98 So.3d 332. When a severance is sought before trial, the standard for obtaining a severance is broader because of the speculation as to what the trial evidence will actually be. After trial commences, the standard is stricter because at that time, the trial judge is able to analyze the evidence which has actually been admitted. *Williams*, 227 So.3d at 394, n. 42.

In reviewing a pretrial motion for severance, the Louisiana Supreme Court has held that "[i]t is incumbent upon us to review the validity of the ruling without regard to whether at trial substantial other evidence was introduced or whether his conviction would have been a certainty irrespective of the joint trial." *Duckett*, 119 So.3d at 178 (citing *State v. Lavigne*, 412 So.2d 993, 997 (La. 1982)).

Before trial, on July 17, 2024, Davon's trial counsel filed a Motion to Sever Defendant for Trial, arguing that she would be presenting antagonistic defenses at a joint trial. She contended that Davon would be forced to blame the other defendants at trial in order to exonerate himself, and therefore, those defendants would have to defend themselves from the State and from Davon. She further argued Davon was not connected to the rap videos, alleged evidence of gang activity, or text messages that were going to be admitted at trial. She maintained that prejudice might occur if evidence that a jury should not consider against one defendant was admitted at a joint trial. She asserted that while witnesses saw three people running from the scene, the evidence would show there were only two shooters. She pointed out that only two firearms were used in the shooting, and they contained the DNA of Daveon and Washington, but not Davon. The State countered the arguments.

The trial judge thereafter denied Davon's motion to sever, finding that defendant had failed to carry his burden of proof regarding the arguments made in support of the motion to sever.[25]

After considering the record and the arguments made by counsel, we find that the trial judge did not abuse his discretion by denying Davon's pretrial motion

---

[25] Washington's trial counsel filed a motion to sever on August 8, 2024, making similar arguments. On the same day, the trial court denied the motion for the reasons stated in open court on July 22, 2024 when denying Davon's motion to sever. Washington filed a writ application with this Court on August 9, 2024, which this Court denied based upon an inadequate showing that the trial court abused its discretion. *See Gilmore*, 24-363 (La. App. 5 Cir. 8/15/24), 2024 WL 3823431.

On August 15, 2024, Daveon's trial counsel filed a Motion to Sever Defendant for Trial for the same reasons cited by Davon's trial counsel in her July motion. On that same day, the trial judge denied Daveon's motion to sever as moot, "for all of the reasons stated in open Court on July 22, 2024."

On August 22, 2024, counsel for Washington and Daveon re-urged their motions to sever defendants for trial, after the jury was selected, but before opening statements. After hearing arguments of counsel, the trial judge denied the re-urged motions to sever. Counsel for all three defendants noted their objections to the trial court's ruling.

to sever defendants for trial.[26]  Davon did not offer evidence in support of his pretrial motion for severance.  Instead, he made general arguments that the defenses presented at trial would be antagonistic.  None of the defendants gave statements to the police after the instant homicide, or blamed each other.  Davon's motion to sever acknowledged that witnesses saw three people flee the scene. Justice does not require severance where only the extent of participation of each defendant is at issue.  *See Duckett*, 119 So.3d at 177.  Further, Davon failed to demonstrate that his co-defendants would testify at a separate trial or that their testimony would exculpate him.  The State also asserted that evidence would be offered at trial showing all three defendants were members of the BSY gang. Therefore, that evidence would have been admissible whether the defendants were tried jointly or separately.  In light of the foregoing, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER TWO

### *Admission of other crimes evidence*

Davon's appellate counsel also argues that the trial court erred in admitting other crimes evidence; namely, three YouTube rap videos and a photograph, and by denying post-trial motions based on the same issue.  She argues that the videos are an expression of art, had nothing to do with reality, and cannot be offered as proof that a crime occurred.  Counsel asserts the State asked the jury to infer that based on these rap videos, there was a real gang called "BSY," and Davon was in that gang, and therefore he was a principal to the murder of the victim committed by Daveon and Washington.  Counsel contends the videos were highly prejudicial, and they served only to portray Davon as a bad person.  Additionally, she argues

---

[26] Davon's trial counsel filed a Motion for New Trial arguing, among other things, the trial court erred by denying the motion to sever; however, she did not raise the denial of this motion in this assignment on appeal.

the error in admitting the other crimes evidence was not harmless because the verdict was not solely unattributable to the error.

The State, however, contends the videos, which showed the defendants and Ja'Marian Price were associates in the BSY gang, were admissible as *res gestae* for the purpose of narrative cohesiveness and to prove intent and motive under La. Code of Evidence article 404(B). The State argues that the videos were necessary to establish the victim was killed in a gang retaliation murder. Alternatively, the State argues that any error in the admission of the videos was harmless considering the otherwise overwhelming evidence of defendant's guilt.

On May 8, 2024, the State filed "State's Notice of Intent to Introduce Evidence as Res Gestae or in the Alternative under La. C.E. Article 404(B)." In its notice, the State asserted it intended to introduce evidence of defendants being members or associated with a group/gang known as the "Betty Street Youngins" ("BSY"), before and during the moments leading up to the murder. The State averred it intended to introduce this evidence through text messages, witness testimony, and rap videos. Specifically, the State said it intended to introduce evidence that the murder in the instant case was a gang retaliation murder for the killing of Ja'Marian Price, a member of BSY, that had occurred nine days earlier.

On June 11, 2024, Davon's trial counsel filed an opposition to the State's motion. In her opposition, counsel argued the State should not be allowed to introduce evidence of *res gestae*/other alleged crimes or bad acts because this evidence was not *res gestae*, the State had not met its burden regarding the exception it intended to use as justification under Article 404(B), the State failed to establish the alleged prior bad act was actually at issue relative to Davon, and this evidence was far more prejudicial than probative.[27]

---

[27] Also on June 11, 2024, Daveon's trial counsel filed a written motion to adopt Davon's opposition.

On July 11, 2024, a hearing was held on the State's Article 404(B) motion. Davon's counsel argued the text messages came from Washington's phone, and those text messages were not connected to Davon. She also argued the State had no evidence Davon was a member of the BSY gang. Also, Davon's counsel asserted the rap videos were prejudicial and were disproportionately used against defendants of color. She pointed out the State did not have to prove motive.

At the hearing, Daveon's counsel adopted the arguments of Davon's counsel and made additional ones. He argued rap videos were art, the point of rap videos was to create a fictitious image of the artist, they were just performances, and the First Amendment protected this type of expression. Daveon's counsel further argued the State failed to establish the alleged prior bad acts were evidence or relevant to Daveon.[28]

The prosecutor responded that she was seeking to introduce the *res gestae* or "404(B)" evidence so the jury could be made aware of what happened, namely, that this was not a random hit of a young kid, but rather was a targeted hit while people were surrounding the victim, and no one else got injured. She contended that if she was only allowed to introduce evidence that a fifteen-year-old boy who was not connected to the defendants was gunned down for no reason, that would not make sense to the jury and there would be no narrative completeness without the evidence in question. The prosecutor asserted that in *State v. Lewis*,[29] rap

---

[28] At the hearing, Washington's counsel adopted the written opposition of Davon's counsel and the oral arguments of counsel for Davon and Daveon, and he also made additional arguments. He reiterated that the Louisiana State Constitution provided greater protections for speech than the U.S. Constitution and the First Amendment.

[29] In *State v. Lewis*, 16-1361 (La. 7/19/16), 195 So.3d 1206, the Louisiana Supreme Court stated the following:

> Writ granted. We find that the trial court abused its discretion in finding the defendant's rap video inadmissible. Provided that a sufficient foundation is established, the defendant's inculpatory rap video is relevant under La. C.E. art. 401. It is likewise admissible under C.E. art. 404(B), as it constitutes proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident." If the defendant decides to testify, she is of course free to argue otherwise. However, this issue goes to the weight of the evidence and not its admissibility, and the jury is entitled to hear the evidence

videos clearly fall under "404(B)." She argued the evidence in question was relevant and admissible.

The trial judge admitted into evidence at the hearing the JPSO investigative report for Mr. Price's murder, the JPSO investigative report for the instant offense, and the jump drive that contained the rap videos and photograph at issue. These three exhibits were attached to the State's notice of intent. After hearing arguments of counsel, and after viewing the rap videos and the photograph on the flash drive, the trial judge granted the State's motion, ruling that the evidence would be admissible as *res gestae* and under Article 404(B).[30]

At trial, Detective Keller identified a USB containing the three rap videos and still shots from the videos that he testified about. After a lengthy hearing outside the presence of the jury, the trial judge found the State laid a proper foundation with regard to authentication of the videos. The trial judge then admitted them into evidence, and they were played for the jury.

---

and accord it the weight it deserves, if any. Finally, the probative value of the defendant's apparently prophetic words outweighs "the danger of unfair prejudice" under La. C.E. art. 403. We therefore grant the writ and reverse the decision of the trial court.

[30] On August 5, 2024, Washington's counsel sought supervisory review of the trial court's July 11, 2024 ruling granting the State's "404(B)" motion. This Court denied the writ application, finding it was deficient as it failed to include a transcript of the hearing, the three exhibits admitted at the hearing, and a copy of the State's 404(B) pleading. *See State v. Washington*, 24-351 (La. App. 5 Cir. 8/15/24), 2024 WL 38234427.

On August 9, 2024, Davon's counsel sought supervisory review of the trial court's July 11, 2024 ruling granting the State's "404(B)" motion. This Court denied the writ on the showing made with respect to the rap videos because they were not attached to the writ. This Court found that to the extent the writ addressed the text messages, the trial court did not abuse its discretion by ruling the text messages admissible as proof of motive under La. C.E. art. 404(B) and *res gestae. See Gilmore*, 24-363 (La. App. 5 Cir. 8/15/24), 2024 WL 3823431.

On August 12, 2024, Daveon's counsel sought supervisory review of the trial court's July 11, 2024 ruling granting the State's "404(B)" motion. This Court pointed out that Daveon's counsel was challenging the three rap videos, but not the text messages or the photograph. This Court granted the writ in part and denied it in part, granting relief to relator regarding video 1, disallowing its introduction at trial. The State filed an application for rehearing, which this Court granted, vacating the ruling as to video 1, and denying the writ application in full. *See State v. Daveon Gilmore*, 24-368 (La. App. 5 Cir. 8/15/24), 2024 WL 3863550, *vacated in part on reh'g*, 24-368 (La. App. 5 Cir. 8/16/24), *writ denied*, *stay denied*, 24-1035 (La. 8/17/24), 390 So.3d 1289.

The fundamental rule in Louisiana governing the use of evidence of other crimes, wrongs, or acts is that such evidence is not admissible to prove the accused committed the charged crime because the defendant has committed other such crimes in the past. *State v. Thomas*, 19-582 (La. App. 5 Cir. 7/29/20), 300 So.3d 517, 526, *writ denied*, 20-1503 (La. 3/2/21), 311 So.3d 1053. However, while the State may not admit evidence of other crimes to prove the defendant is a person of bad character, evidence of prior crimes may be admitted if the State establishes an independent relevance aside from proving the defendant's criminal character. *State v. Frickey*, 22-261 (La. App. 5 Cir. 3/1/23), 360 So.3d 19, 49, *writ denied*, 23-468 (La. 11/8/23), 373 So.3d 59. Evidence of other crimes, wrongs, or acts is allowed to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct, formerly referred to as *res gestae*, that constitutes an integral part of the act or transaction that is the subject of the present proceeding. *Id. See also* La. C.E. art. 404(B)(1).

*Res gestae* events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the State could not accurately present its case without reference to them. *State v. Rodney*, 19-195 (La. App. 5 Cir. 10/23/19), 282 So.3d 395, 403. The *res gestae* doctrine is designed to allow the story of the crime to be told in its entirety by proving its immediate context of happenings in time and place. *Id.* Close connection in time and location is required between the charged and uncharged conduct to ensure that "the purpose served by admission of the other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place." *State v. Smith*, 23-263 (La. App. 5 Cir. 12/27/23), 379 So.3d 206, 212. The test of whether *res gestae* evidence is admissible is not simply whether the State might somehow structure its case to avoid any mention of the uncharged act or conduct, but whether doing so

would deprive its case of narrative momentum and cohesiveness, with power not only to support conclusions, but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict. *Id.*

Even when the other acts evidence is offered for a purpose allowed under Article 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. *Frickey*, 360 So.3d at 50. In order for other acts evidence to be admitted under La. C.E. art. 404(B)(1), one of the factors enumerated in the article must be at issue, have some independent relevance, or be an element of the crime charged. *State v. Lawson*, 08-123 (La. App. 5 Cir. 11/12/08), 1 So.3d 516, 525-26. The State is only required to make some showing of sufficient evidence to support a finding that the defendant committed the other independently relevant acts. *State v. Breaux*, 22-581 (La. App. 5 Cir. 5/10/23), 366 So.3d 727, 736 (citing *State v. Taylor*, 16-1124, 16-1183 (La. 12/1/16), 217 So.3d 283, 291-92). Additionally, the probative value of the extraneous evidence must outweigh its prejudicial effect. La. C.E. art. 403; *State v. Shorter*, 23-128 (La. App. 5 Cir. 11/29/23), 377 So.3d 421, 436, *writ denied*, 23-1669 (La. 5/29/24), 385 So.3d 704.

The defendant bears the burden to show that he was prejudiced by the admission of the other crimes evidence. *State v. Miller*, 10-718 (La. App. 5 Cir. 12/28/11), 83 So.3d 178, 187, *writ denied*, 12-282 (La. 5/18/12), 89 So.3d 1191, *cert. denied*, 568 U.S. 1157, 133 S.Ct. 1238, 185 L.Ed.2d 177 (2013). Absent an abuse of discretion, a trial court's ruling on the admissibility of evidence pursuant to La. C.E. art. 404(B)(1) will not be disturbed. *State v. Maize*, 16-575 (La. App. 5 Cir. 6/15/17), 223 So.3d 633, 649, *writ denied*, 17-1265 (La. 4/27/18), 241 So.3d 306.

As noted above, this Court has already found that the trial court did not abuse its discretion by ruling that the three rap videos were admissible at trial as

"404(B)" and *res gestae* evidence. *See State v. Daveon Gilmore*, 24-368 (La. App. 5 Cir. 8/15/24), 2024 WL 3863550, *vacated in part on reh'g*, 24-368 (La. App. 5 Cir. 8/16/24), *writ denied*, *stay denied*, 24-1035 (La. 8/17/24), 390 So.3d 1289. However, this Court pointed out that the trial court may nonetheless exclude introduction of that evidence from trial should the State fail to satisfy all other applicable rules of evidence, citing *Taylor*. *Id.*

In *Taylor*, the Supreme Court found that while the rules of evidence were relaxed in a pretrial hearing to determine what evidence may be offered at trial, the State would still be required to adhere to the rules of evidence when presenting evidence of the "404(B)" incident at trial. The Supreme Court further found that should the State not properly present competent evidence at trial, the trial court may exclude the other crimes evidence at that time. *Taylor*, 217 So.3d at 294.

Upon review, we find the State presented competent evidence of the videos and still shots at trial, and therefore, the trial court did not abuse its discretion by admitting that evidence at trial. Further, no evidence was introduced at the trial to indicate this Court's prior writ dispositions were incorrect.

At trial, Detective Keller explained that Mr. Price and the defendants were associated with the BSY gang. He asserted that he knew this information through gang intelligence gathered over a period of time by many detectives. He logged as evidence videos he located that included the defendants. Detective Keller described what each of the three rap videos and still shots from those videos depicted, and identified the three defendants in still shots from those videos.[31] After considering Detective Keller's testimony in the State's case-in-chief, and after a hearing outside the presence of the jury where defense counsel questioned

_____

[31] Detective Keller's testimony is summarized above.

the witness, the trial judge found the State had laid a proper foundation with regard to authentication of the videos and the still photos.

After the trial judge admitted the videos into evidence, they were played for the jury. Detective Keller provided additional testimony regarding the content of the videos.

Nevertheless, even if the trial court erred by admitting the other crimes evidence, an improper reference to other crimes evidence is subject to the harmless error rule, *i.e.*, whether the verdict actually rendered in the case was surely unattributable to the error. *See State v. Nelson*, 02-65 (La. App. 5 Cir. 6/26/02), 822 So.2d 796, 804-05, *writ denied*, 02-2090 (La. 2/21/03), 837 So.2d 627. Assuming *arguendo* that the trial court erred by admitting the rap videos and the still shots from those videos into evidence at trial, any error was harmless as the verdicts actually rendered were surely unattributable to the error. The State presented overwhelming evidence of guilt even without consideration of the videos and the still shots from them, as this Court has found above in affirming sufficiency of the evidence.

In light of the foregoing, the trial court did not abuse its discretion by admitting into evidence the rap videos and the still shots from them under Article 404(B) or as *res gestae* evidence. This assignment of error is without merit.

## ERRORS PATENT REVIEW

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920, *State v. Oliveaux*, 312 So.2d 337 (La. 1975), and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990). The review reveals no patent errors in this case.

## DECREE

For the foregoing reasons, defendant Davon Gilmore's conviction and sentence for the second degree murder of Ahmad Howard are affirmed.

## AFFIRMED

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. TRAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **AUGUST 27, 2025** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 24-KA-552

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
R. CHRISTOPHER COX, III (DISTRICT JUDGE)
JULIET L. CLARK (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          JANE L. BEEBE (APPELLANT)

### MAILED
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053